CHEHARDY, Chief Judge.
This appeal involves a will contest in which the children of the testator’s first marriage assert their father lacked testamentary capacity when he signed his will from his hospital bed a few hours before his death. From judgment upholding the validity of the testament, the opponents of the will appeal.
William Burton Landry, M.D., the testator, expired at 2:27 a.m. on May 18,1988, at the Veterans Administration Hospital in New Orleans, Louisiana. The cause of death was listed on the death certificate as cardiopulmonary arrest. He had been brought to the hospital less than two days earlier, suffering from pneumonia in addition to pre-existing medical problems resulting from a stroke about a year before. He had been living in a nursing home for some time prior to his final hospitalization.
Dr. Landry’s will was probated by ex parte judgment on July 12,1988. The will, in statutory form and dated May 17, 1988, recited that the testator was married twice, first to Victoria Moussa, from whom he was divorced in 1970 and with whom he had four children: Juanee Landry, Paula Landry, Susan Landry, and William B. Landry III. His second marriage was to Gun-vor J. Finsnes, with whom he had two children: William Kai Alexander Landry and Andrew Gunnar Landry.
In the dispository provisions, Dr. Landry appointed Gunvor J. Finsnes executrix of his estate, with full seizin and without bond, and directed that she receive a fee for her services. He appointed Richard L. Edrington attorney for his estate and for his executrix. He bequeathed to his wife the disposable portion of his property, both community and separate, and directed that his wife have a usufruct for life over all his property, both community and separate. Finally, he bequeathed the balance of his estate conjointly to his six children.[1]
On July 18, 1988, a suit to annul the testament was filed by William Burton Landry III, Victoria Juanne [Juanee] Landry, Susan Landry and Paula Landry. They asserted that the will had not been executed in the presence of the testator, the notary and the two witnesses as required by law and that, at the time the will was allegedly executed, the decedent was dangerously ill, in a semi-comatose state, out-of-touch with reality, and entirely unable to form testamentary intent.
At a hearing on September 2, 1988, testimony was presented regarding the circumstances under which the will was executed and on Dr. Landry’s condition, not only at the time the will was signed but also during the course of -the evening thereafter until he died. In a judgment rendered September 26, 1988, the trial judge ruled that the petitioners failed to show testamentary incapacity or any other defect and, thus, that the will is valid.
In the reasons for judgment the court found, first, that there was no evidence to refute the representations of the attestation clause regarding the signing of the will in the presence of both witnesses and a notary. Next, the court discussed some of the testimony regarding the decedent’s apparent physical and mental condition at the time the will was signed. He concluded there was “not even a preponderance of the evidence, much less the clear and convincing evidence needed,” to show that the decedent lacked testamentary capacity when he executed his will. The court pointed out that the unsteadiness of the testator’s signatures resulted from the splint and intravenous tube attached to Dr. Landry’s arm rather than from mental incapacity.
The plaintiffs filed a motion for new trial on the ground of newly-discovered evidence, specifically, the testimony of a hospital chaplain who was out of the country during the trial and therefore could not be *1109 subpoenaed to testify. The court granted a new trial solely to permit the introduction of this witness’ deposition into evidence. After considering the deposition, the court concluded there was still insufficient evidence to overcome the presumption of testamentary capacity, and again upheld the validity of the will.
The plaintiffs have appealed. They argue the testator lacked the capacity to understand and to sign the will at the time it was executed and that the executrix failed to prove that the will was executed according to the statutory formalities.
FACTS
The evidence adduced at trial established that the 60-year-old testator had suffered a stroke approximately a year before his death. His left side was paralyzed from the stroke. He had been a patient in a Kenner nursing home for some time prior to his final hospitalization, which occurred on May 16, 1988. He used eyeglasses when reading. Because some of the evidence is vigorously disputed, we set forth the relevant testimony of all the witnesses.
CHARLES WARTELLE
Charles F. Wartelle, the notary on the will, testified as follows: He is an attorney associated with the law firm of Richard Edrington, Dr. Landry’s attorney. He had never met Dr. Landry prior to the execution of the will, but at Mr. Edrington’s request he took the will to Dr. Landry at the Veterans Administration Hospital in New Orleans so it could be signed.
The signing of the will took place between 2:30 and 3:00 in the afternoon of May 17,1988. Wartelle observed the testator and the witnesses sign the will. Dr. Landry was lying in a hospital bed in the Intensive Care Unit (hereafter referred to as “ICU”) with a removable plastic oxygen mask over his face. Other family members were present and Dr. Landry conversed with them from time to time. When the will was signed, the pen was placed in Dr. Landry’s hand by someone else, but no one assisted him in signing his name, except for holding the paper steady. Dr. Landry was wearing his wife’s glasses when he executed the will.
Wartelle was aware Dr. Landry suffered from some kind of medical condition. A doctor was in the room during part of the time he was there. Wartelle had no conversation with any medical personnel regarding Dr. Landry’s competency.
MARGARET BRADLEY
The witnesses to the will were Margaret Landry Bradley, the testator’s sister, and C. William Bradley, Jr., who is her son and the testator’s nephew. Mrs. Bradley testified as follows:
She had been at the hospital since nine or ten that morning. She went in the room from time to time, but mostly stayed outside the room observing her brother through the glass enclosure. She and her brother conversed during the course of the day — “He seemed very restless. He was very alert. He was not able to sleep.” Dr. Landry’s wife, Gunvor, and their son Kai also were there most of the day. Later Mr. Wartelle and Mrs. Bradley’s son came.
Mrs. Bradley was unaware that a will was to be signed until a half-hour after Mr. Wartelle arrived, when he asked her to be a witness. He had asked the attending physician, Dr. Yvonne Satterwhite, to be a witness but, Mrs. Bradley said, the doctor declined on the basis it was against the hospital policy.
The execution of the will took place in the early afternoon, in the presence of Gun-vor Landry, Kai Landry, Margaret Bradley, William Bradley, Mr. Wartelle, and a male nurse. When the will was brought to him Dr. Landry read the will and signed it, then said he was glad this had finally come about, he had been waiting for this.
Dr. Landry signed the will himself. He was paralyzed on the left side and had a splint on his right arm that extended almost to his fingertips. When the pen was put in his hand he could hardly grasp it because of the splint. He read the will before he signed it; the male nurse had taken the medical records off his clipboard, put the will on the clipboard, and handed it *1110 to Dr. Landry. Dr. Landry borrowed his wife’s glasses, read the will and signed it.
Although his left side was paralyzed, his left eye would function sometimes; he recognized Mrs. Bradley the night before from 40 feet away, without his glasses on.
When Mrs. Bradley arrived at the hospital that morning, a hospital chaplain was in the room with her brother about five minutes after she arrived and she watched through the glass. When the priest came out, she told him she was Dr. Landry’s sister and he told her, “I want you to know that he is very conscious and he knows what is going on. He knows everything that is going on and we had a long conversation.”
She did not know the name of this priest, but said he told her he was the hospital chaplain. She said he was asked to be a witness to the will, but was saying Mass and sent an assistant up instead. The assistant chaplain told them he would rather not be a witness.
C. WILLIAM BRADLEY JR.
C. William Bradley Jr., the other witness to the will, is the testator’s nephew. He is also an attorney. He testified as follows:
He went to the hospital from his office, after receiving a telephone call from his mother requesting him to witness the will. He was unaware his uncle had pneumonia and was in critical condition. He estimated he was at the hospital for 20-30 minutes.
When he arrived at the hospital, his uncle was in bed with an IV tube in his right hand and an oxygen mask on his face, which he would move in order to talk. He appeared to be awake, oriented, and alert. He had a number of brief conversations with Bradley. His speech was not slurred and Bradley could hear him plainly. One of their conversations related to a European trip they had taken together some years before; another concerned some legal matters Bradley had handled for him. Dr. Landry discussed these freely and easily with no difficulty at all. His uncle also conversed with others.
He observed his uncle read the will and then sign it in two places. He also observed his mother and the notary sign the will. His uncle did have difficulty making his signature and made some comments regarding that. He had a wooden splint on his right hand to support the IV tube, which made it difficult for him to hold the pen. His uncle was wearing glasses when he read the will; Bradley did not know whether they were his own. There was a male nurse present in the room while Bradley was there, but he did not recall seeing a doctor.
DR. YVONNE SATTERWHITE
Dr. Yvonne Satterwhite was Dr. Landry’s attending physician at the hospital. She testified she began treating Dr. Landry at 7:00 a.m. on the morning of May 17th. He had been admitted at 10:20 the preceding night with a diagnosis of pneumonia, sepsis and atrial fibrillation.
Questioned about Dr. Landry’s condition between 1:00 and 3:00 p.m. on May 17th, Dr. Satterwhite testified he was more comfortable, more alert, and was breathing more easily than he had been that morning. He answered her questions regarding his physical condition appropriately. He did “fairly well” until 8:30 or 9:00 p.m. that evening.
She was asked to be a witness to the will, but refused for two reasons: First, because she felt that interns and residents should be involved only in the patient’s medical care and should not make any decisions about insurance, disability or legal matters. Secondly, the patient was ill and in ICU, and she did not feel qualified to examine him for competency. She felt that signing as a witness to the will would be equivalent to a certification that he was competent.
She could not recall making any statements to Bill and Susan Landry, on the evening of the 17th, that that was the best their father had been all day. She did recall telling them that she had been quite concerned about his prognosis that morning but that his condition had improved that afternoon.
VICTORIA ADJAMI
Victoria Adjami, a friend of Susan Landry, testified she visited the hospital with *1111 Susan the evening of the 17th at around 7:40 p.m. She was in Dr. Landry’s room for about 10 minutes. She noticed that the bed shook whenever he took a breath. He was not awake when they arrived and “had to be told by his children by name that they were there.” His speech seemed slurred and very gruff; she had trouble understanding him. He asked Susan not to make him speak because it hurt too much.
WILLIAM LANDRY III
William B. Landry III testified he visited his father about 7:30 the evening of the 17th. His father was having trouble breathing and took a few seconds to recognize him. William did not converse with his father during the visit, but his father did speak to Susan. His speech was garbled. He indicated he was in pain and he asked the nurse for medication. There was no mention that a will had been made earlier that day.
The visit lasted about 15 minutes. After seeing his father, he spoke with Dr. Satter-white, who said his condition had improved since earlier that day.
William testified his father was paralyzed on the left side and blind in the left eye from the stroke he had suffered the year before. He admitted, however, that he had not seen his father for months prior to this visit.
SUSAN LANDRY
Susan Landry testified that when she visited her father the evening of the 17th, he looked extremely uncomfortable. His body was “very violent” every time he breathed. She stated Dr. Satterwhite told her, “Believe it or not, this is a vast improvement of the last twelve hours of your father’s condition.”
Susan said that, when her father was hospitalized at East Jefferson, he told her he had lost his sight in one eye. She did not know whether that condition had changed subsequently. Her father wore glasses to read or to watch television and she had never known him to use his wife’s glasses. Her father had never discussed a will with her and did not tell her he had executed a will that day.
GUNVOR LANDRY
Gunvor Landry testified as follows:
Her husband had requested that the will be prepared a long time before the day it was signed-. He had told her exactly what he wanted Mr. Edrington to write for him. On the day the will was signed, she had stopped by Edrington’s office on other business and Edrington, upon learning Dr. Landry was in the hospital, suggested that Wartelle take the will to the hospital to be executed.
When she arrived at the hospital, her husband was very happy to see her and talked to her normally — “just chitchatting.” She did not remember what they talked about. Her sister-in-law, Margaret Bradley, was present and Bill Bradley arrived later. She recalled her husband talked to his nephew about visiting Austria and about some legal matters his nephew had handled for him.
She asked her husband if he was up to signing some papers and he asked her what it was. When she told him it was the will he said, “Oh good, give me the pen.” She slid the pen in his hand; he had difficulty holding it because the splint on his right arm was strapped to his hand. The male nurse adjusted the bed to put Dr. Landry in a sitting position. Her husband asked her for her glasses; she said he used her glasses to read it because he always used her glasses if he did not have his own with him. She observed him sign the will.
She had never heard anything about her husband being blind in the left eye. He had requested her not to call his children to notify them of his hospitalization because he said they would just upset him.
RUTH HOVLAND
Ruth Hovland testified by deposition. She stated she had known Dr. Landry for over 40 years and Gunvor Landry for about 20 years and considered herself a close friend of both. She had visited him during his convalescence at the nursing home and he had never had a problem conversing in a normal manner. She said the stroke did not appear to have affected his mental *1112 faculties, although he was paralyzed in the left arm and leg.
She also visited Dr. Landry on Monday, May 16, 1988, at Veterans Hospital in New Orleans. Mrs. Landry had called her from New Orleans about 10:00 p.m. and requested her to bring Kai, the Landry s’ 16-year-old son, to the hospital. When Mrs. Hov-land arrived at the hospital, she saw Dr. Landry was in the ICU. Mrs. Landry and Margaret Bradley were there.
When Dr. Landry saw Mrs. Hovland waiting outside the door of the room, he called her by her nickname — “Rufus”—and asked her to come in to see him. She visited him for a few minutes and they chatted briefly. She had no problem understanding him and he seemed to have no problem understanding her. There was no indication of memory loss or mental difficulty. She testified she was not aware of any blindness in Dr. Landry’s .left eye. She knew he wore glasses to read.
FATHER LAWRENCE DEMARIA
The deposition testimony of Father Lawrence DeMaria was admitted on the granting of plaintiffs’ motion for new trial because he was out of the country and could not be subpoenaed when the trial took place.
DeMaria testified he serves as a chaplain at the Veterans Administration Hospital in New Orleans. On May 17, 1988, the chief chaplain requested him to serve as a witness for a patient in ICU. When DeMaria arrived at ICU there was a group of people, whom he assumed were relatives of Landry, the patient. They told him the patient was going to make a will and they wanted him to be a witness.
DeMaria walked into the room and saw the patient. Then he found the doctor and asked whether she thought the patient was mentally capable to make a will. She told him, “Yes and no.” She was doubtful, but said she didn’t know. DeMaria then returned to ICU and told the people he preferred not to be involved.
DeMaria testified he was in the room with the patient about a minute. The patient was very sick and did not speak to him. He could not tell whether the patient was conscious. DeMaria stayed long enough to determine the patient had already received the sacrament for the dying.
DeMaria testified he refused to sign because he thought “it was better not to be involved in something like this” and he was not sure of Dr. Landry’s condition. He has never been asked to witness any other wills at the hospital.
LAW
The appellants assert the trial court erred in the following respects:
(1) Refusing to allow testimony concerning the testator’s condition prior to and following the moment at which the contested will was executed;
(2) Failing to consider medical evidence introduced as to the testator’s condition hours before and hours after the moment at which the will was executed;
(3) Finding that the defendant carried her burden of proving the will was executed in proper form;
(4) Finding that the plaintiffs failed to prove that the testator was incompetent to execute his will on the date and time in question;
(5) Considering the deposition of Father Lawrence DeMaria rather than allowing him to testify before the court; and
(6) Finding that the testimony of Father DeMaria would not change the outcome of the trial court’s decision.
LSA-C.C.P. art. 2932 provides,
“The plaintiff in an action to annul a probated testament has the burden of proving the invalidity thereof, unless the action was instituted within three months of the date the testament was probated. In the latter event, the defendants have the burden of proving the authenticity of the testament, and its compliance with all of the formal requirements of the law.”
Because this action was brought less than three months after the will was probated, therefore, it was the burden of the executrix, Gunvor Finsnes Landry, to prove the will was authentic and proper in form. *1113 Although the plaintiffs claim she failed to carry this burden of proof, we do not agree.
LSA-R.S. 9:2442 establishes the following as the formal requirements for a statutory will: The testator must know how to sign his name and must know how to and be physically able to read; there must be a notary and two witnesses present during the execution of the will; the testator must declare or signify to the notary and witnesses that the instrument is his last will and must sign his name at the end of the will and on each other separate page of the instrument; and, in the presence of the testator and each other, the notary and the two witnesses must sign the attestation clause.
The appellants admit Dr. Landry knew how to sign his name and how to read, but contend Dr. Landry was physically unable to sign the will himself and was physically unable to see well enough to read it. They also contend the signatures on the will are so unlike his normal signature as to establish he could do “nothing more than make his mark” (thus, invoking the formal requirements of R.S. 9:2442(C) —in which the testator would be required to signify he is unable to sign because of physical infirmity, with the attestation clause reflecting that fact)..
We find no merit to any of these arguments.
First, the testimony of Wartelle and the Bradleys establishes Dr. Landry did indeed sign the will himself. The gist of their testimony is that Dr. Landry, using his wife’s glasses, read the will and did sign his own name, despite the difficulty of holding the pen and signing his name with a splint on his arm. Further, the whole context of the situation during which the will was signed shows Dr. Landry plainly indicated it was his testament.
The appellants point also to testimony that Dr. Landry was blind in the left eye as a result of his stroke. That fact is disputed, given the testimony of Gunvor Landry and Ruth Hovland that they were unaware of any such blindness. Whether or not it was true, it is of no consequence; there is no evidence that he could not read with his right eye.
Similarly, the appellants challenge the testimony that Dr. Landry used his wife’s glasses while reading the will; they assert the defendant failed to prove the decedent was able to see through his wife’s glasses. We find no merit to this argument. The testimony of those present at the execution of the will establishes that the testator, to all appearances, could see adequately enough through the glasses to read and sign the will.
The trial judge believed the notary and the two witnesses; this is a credibility finding, which cannot be overturned in the absence of manifest error. Succession of Franz, 232 La. 310, 94 So.2d 270 (1957). Our reading of the testimony convinces us the trial judge’s ruling was entirely reasonable.
Further, the signatures on the will are plainly signatures rather than “marks,” whether or not they are the decedent’s normal signatures; any differences are easily explained by the difficulty of using a splinted hand. See Succession of Sullivan, 509 So.2d 844 (La.App. 1 Cir.1987).
As to the issue of Dr. Landry’s capacity to make a will, the burden of establishing lack of testamentary capacity is on the party attacking the will. Succession of Kilpatrick, 422 So.2d 464 (La.App. 2 Cir. 1982), writ denied 429 So.2d 126.
There is a strong presumption in favor of testamentary capacity. Succession of Lyons, 452 So.2d 1161 (La.1984). A party alleging lack of testamentary capacity must overcome the presumption of capacity by clear and convincing evidence. Id.
The capacity to make a will is tested as of the time the will was made, and the presumption of sanity continues until proved otherwise. Cormier v. Myers, 223 La. 259, 65 So.2d 345 (1953). The test is whether such capacity exists at the moment the will was made. Succession of Orlando, 419 So.2d 559 (La.App. 4 Cir. 1982).
*1114 The question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Sauls, 510 So.2d 715 (La.App. 1 Cir.1987). “Testamentary capacity” means possession of one’s mental faculties to the extent that the testator has full knowledge and understanding of the import and effect of his action. Succession of Brown, 251 So.2d 465 (La.App. 1 Cir.1971).
In determining testamentary capacity, courts will consider the physical and mental condition of the testator not only at the time of execution, but also prior and subsequent thereto, since the actions, conduct and physical and mental condition of the testator before and after the execution of the will are of probative value in deciding testamentary capacity. Succession of Keel, 442 So.2d 691 (La.App. 1 Cir.1983).
Testamentary capacity is solely a question of fact to be determined by the trial court and its finding will not be disturbed on appeal in the absence of manifest error. Succession of Sullivan, supra.
In considering the applicable law, we conclude the trial judge erred in failing to allow the plaintiffs to present further evidence of the testator’s condition before and after the will was executed. That ruling does not constitute reversible error, however, because the evidence establishes that at the moment the will was executed Dr. Landry had the capacity to understand what he was doing.
In fact, the trial judge admitted testimony as to the testator’s condition and behavior both hours before and hours after the will was signed. Regardless of the appellants’ arguments, we find no manifest error in the trial judge’s ruling that Dr. Landry was competent to execute the will. The appellants have failed to show that further testimony would establish otherwise.
Finally, we find no error in the trial court’s refusal to allow the plaintiffs to present the live testimony of Father DeMaria. The plaintiffs filed his deposition with their motion for new trial; the judge obviously read the deposition and considered it in making his final ruling. We agree with the judge that this testimony does not change the conclusions reached in the original decision. The appellants make no showing they would have elicited any different information from the witness at a hearing than was contained in the deposition.
For the reasons assigned, the judgment of the district court is affirmed. The cost of this appeal is assessed against the appellants.
AFFIRMED.

. Although it is not relevant to the issues on appeal, we note as a matter of interest that a separate suit to annul probate was filed on August 18, 1988, by one Juliann Landry McCain, alleging she is a child born of a marriage between the decedent and Julia Stubbs Landry. She alleges the will is void because she is a legitimate and/or natural child of the decedent, yet she was not mentioned, designated or identified in the will. This claim was still pending when the present appeal was taken.